Hoover, J.
{¶1} The children's biological father appeals the trial court's judgments that awarded Washington County Children Services, ("the agency") permanent custody of his three children: eight-year-old B.L.J., Jr.; five-year-old B.X.L.; and four-year-old J.M.L. We consolidated the appeals for purposes of review and determination. For the reasons that follow, we affirm the trial court's judgments.
I. FACTS
{¶2} On October 1, 2016, law enforcement officers responded to the home that the children shared with their mother[1] and their maternal grandfather. The officers arrested the grandfather for drug trafficking and contacted the agency.
{¶3} At the time of the grandfather's arrest, the mother was incarcerated in the Erie County Jail, and the agency did not know how to contact the father. Caseworkers also found the grandfather's home infested with bed bugs and roaches. The agency thus removed the children from the home.
{¶4} A couple of days later, the agency filed complaints that alleged the three children were abused and dependent and that requested temporary custody of the children. After the trial court adjudicated the children dependent (and dismissed the abuse allegations), the parties agreed to a dispositional order placing the children in the agency's temporary custody.
{¶5} On March 7, 2018, the agency filed motions that requested the court to grant it permanent custody of the children. The agency alleged that the children have been in its permanent custody for twelve or more months of a consecutive twenty-two month period, and that placing the children in its permanent custody is in their best interests.
{¶6} At the permanent custody hearing, caseworker Brookann Dixon testified that the agency developed a case plan for the parents. The father's case plan required him to complete a mental health and drug and alcohol assessment and to follow treatment recommendations. She stated that the father completed an assessment in early November 2016 and that until February *911 2017, he consistently attended counseling. Dixon indicated that starting in February 2017, the father's counseling attendance became sporadic. She explained that the father attended counseling on January 27, 2017, and on March 3, 2017, but he did not have any other appointments during that time.
{¶7} Dixon stated that she asked the father about the appointments, and the father stated that "those were the only appointments that were scheduled with him." Dixon testified that the father's statement that those were the only two appointments scheduled was "not accurate." Dixon additionally explained that around the third week of April 2017, the father reported that he had two or three appointments since March 3, 2017, when he, in fact, had only attended one appointment. Dixon stated that the father's last counseling appointment was March 29, 2018.
{¶8} Dixon also noted that the father admitted that he "relies heavily on marijuana" to help ease the pain associated with his disease, Charcot Marie Tooth Disease. Dixon related that Charcot Marie Tooth Disease is a debilitating disease that causes the father a great deal of pain. She indicated that she and the father discussed obtaining a medical marijuana card for his use, but he has not done so. Dixon stated that the father tested positive for marijuana several times throughout the case and that he most recently tested positive for marijuana a few weeks before the permanent custody hearing.
{¶9} Dixon testified that she thus does not believe that the father has completed the counseling requirement contained in the case plan. She explained that "[t]here's still a great deal of concern regarding his mental health and anger issues and substance abuse as well. He still relies heavily on marijuana."
{¶10} Dixon later emphasized that she "still [has] huge major concerns regarding [the father]'s mental health." Dixon related that in December 2017, police responded to the father's home after receiving a report "that he was attempting suicide by ingesting pills and cutting himself." She explained that in February 2018, she asked the father about the incident; he admitted that he tried to cut himself, but he denied that he attempted to ingest any pills. Dixon related that the father stated, "he is in a funk and pretty depressed right now," and that he discussed "in great detail * * * the depression he's facing now."
{¶11} Dixon additionally stated that the father did not comply with the case plan requirement to obtain stable housing suitable for the children. She indicated that in January 2018, the father reported that he was homeless. Dixon also explained that in March 2018, she tried to schedule a home visit with the father. She testified that she spoke with the father numerous times over the phone and asked for an address. The father informed Dixon that he did not know the address. Dixon advised the father to let her know when he obtained the address, but he never did.
{¶12} Dixon explained that in April 2018, the father reported that he was living in Sandusky. Dixon looked up the address the father provided on Google Maps, but it did not show an address. Dixon then contacted Erie County Children Services. A caseworker went to the address that the father provided and "confirmed that there was just an empty lot there." Dixon stated that she also confirmed her finding that the address did not exist through the Erie County Auditor's Office and the Erie County Sheriff's Department.
{¶13} Dixon stated that the father did not attend all of his available visits with the children. She related that the father *912 scheduled eighteen out of the eighty-six visits that the agency would have permitted. Dixon credited the father for not scheduling visits and then failing to appear. She also recognized that the father had some struggles attending visits due to the distance and the cost of gas to travel from Sandusky to Washington County. She stated that the agency provided some gift cards for gas and even tried to find more of a midway point between Sandusky and Washington County to hold the visits. Dixon explained that due to the distance, she was unable to find a feasible alternative.
{¶14} Dixon stated that when the father did visit the children, he interacted appropriately with them. She related that the children "do well with him" and that the father "engages them well." Dixon explained that during the father's last visit, he was playing with the children and being "a good Father." Dixon testified that she has "no doubt" that the father "loves the kids and the kids love him."
{¶15} Dixon agreed that the father complied with the case plan requirement to take a parenting class.
{¶16} Dixon stated that the case plan required the father to refrain from criminal activity. She indicated that the father was on probation and that he seems to have complied with the terms of his probation. Dixon further noted, however, that in late 2017, the father's ex-girlfriend claimed that the father assaulted her. She stated that a criminal charge against the father remains pending.
{¶17} Dixon testified that the case plan also required the father to demonstrate an "ability to meet the children's needs through employment benefits or other resources." She explained that the father receives Social Security due to his disease and has not been actively employed. The father advised Dixon that he receives $ 735 per month and that the amount would increase if the children were in his custody. The father also informed Dixon that he earns income by performing some tattoo work. Dixon stated that Social Security appears to provide the father's only source of stable income. She related that she has concerns about the father's ability to provide for the children's needs on his limited income.
{¶18} Dixon testified that the two oldest children receive counseling services. B.J.L., Jr. was referred to counseling due to (1) "the trauma of this case; [2 his] exposure to substance abuse; [3] neglect; [4] the physical abuse that [he] admitted being exposed to;" and (5) "to sexual abuse by members of [the father]'s family." B.X.L. was referred to counseling "for behavioral reasons." Dixon stated that B.X.L.'s counselor "was not really able to do a lot with [him] because of the communication barrier." Dixon noted that the foster mother reported that B.X.L.'s speech was difficult to understand.
{¶19} Dixon additionally explained that J.M.L. and B.X.L. have IEPs due to their speech issues and that they also receive speech therapy. Dixon stated that all three children have improved both behaviorally and academically while in the foster home.
{¶20} Dixon concluded by stating that despite some progress, the agency still has concerns whether the father would refrain from domestic violence, whether he would maintain stable housing suitable for the children, and whether he would adequately address his mental health and substance abuse issues by consistently attending counseling. She thus does not believe that the father can provide the children with a legally secure permanent placement.
{¶21} Dixon further believes that placing the children in the agency's permanent custody is in their best interest. She elaborated: "I've seen them thrive in the [foster *913 home]. And I believe they need that stability in order to continue to thrive."
{¶22} Dixon recognized that the foster parents are unable to adopt the children and that placing the children in the agency's permanent custody thus may result in the children being placed in different permanent homes. She further stated, however, that neither parent can provide for the children's basic needs. Dixon explained that the children need a stable home and a responsible adult who can provide for their basic needs, who takes them to counseling, who ensures that they attend school, and who does not expose them to substance abuse or domestic violence. Dixon believes that the risk that the children might be separated "outweighs the risks of them returning home at this time."
{¶23} Chelsea Smith testified that she counseled the father for chemical dependency and that they discussed "various topics," including mental health. Smith stated that she recommended that the father attend individual therapy sessions every other week. Smith explained that at first, the father engaged in therapy and actively participated. She thought the father seemed "[v]ery willing to be there, very motivated to do the right thing, and do what he needed to do to reach his case plan." Smith cautioned, however, that while the father seemed to maintain his motivation, his attendance eventually became less frequent.
{¶24} Smith indicated that the father's attendance became more sporadic after May 2017, near the time that she went on maternity leave. She stated that she saw the father on May 26, 2017, and that she started her maternity leave at the end of June 2017. Smith explained that the father had scheduled an appointment for September 13, 2017, shortly after she returned from her maternity leave. She related that the father did not attend the September 13, 2017 appointment and did return until February 2018. Smith testified that the father then attended two appointments in March 2018.
{¶25} The foster mother testified that the three children have been in her home since October 2016. She indicated that when the children first entered her home, she had difficulty understanding J.M.L. and B.X.L. The foster mother explained that she "could hardly understand" B.X.L. and took him to speech therapy. The foster mother stated that J.M.L. had similar speech problems. She stated that both children's speech has improved while in her care.
{¶26} The foster mother additionally explained that B.X.L. engaged in counseling due to some behavioral issues. She stated that once B.X.L. started visiting and talking with the mother, "he would act out violently." The foster mother related that the child would "[s]ay that he wanted to do certain things to his Mom," "like strangling her." She also testified that B.X.L. "would just have outbursts and fits * * * and wouldn't listen." The foster mother believes that the behavioral therapy has helped B.X.L. and stated that he is "a lot better."
{¶27} The foster mother related that the father has had consistent phone contact with the children. She indicated that the father called the children every Sunday, promptly at 6 pm. The foster mother testified that the father's visits, however, were "spotty." She nevertheless found that the children enjoyed their visits with the father and stated that "[t]hey do good with him."
{¶28} The foster mother also explained that the children are "[v]ery" bonded to one another and also have bonded with her. She stated that she unfortunately cannot adopt the children.
*914 {¶29} The guardian ad litem testified and agreed that the father's situation was difficult due to the distance between Sandusky and Washington County. He nevertheless explained that the father has not reached a point throughout the entire history of the case where the agency could attempt an off-site visit with the father. The guardian ad litem stated that he did not "see any chance of that gap being crossed."
{¶30} The guardian ad litem declared that the children need a legally secure permanent placement. He indicated that the children have "made significant progress" while in the foster home and that he has concerns that the children's needs would not be met if returned to the mother or the father.
{¶31} The father testified that he lived with the children and the mother until Father's Day 2016. The father stated that he left the children with the mother and maternal grandfather on Father's Day 2016, because he "had a crappy Father's Day." The father explained that the mother and grandfather "were too busy getting high in the back room" and that the father "fell asleep on the front floor with the kids, woke up, [and] made them breakfast." He stated that when he woke up, he "realized [he] had to go." The father claimed that he tried to take the children with him, but the grandfather-a drug "kingpin," according to the father-"had three guys standing at [the] front door with pistols to my head talking about, I wish you would touch one of these kids." The father stated that he thus felt he "had no choice" and left without the children.
{¶32} The father indicated that he then returned to Sandusky, where he had an outstanding warrant. The father testified that he turned himself in and went to jail. He claimed that he did not hear anything about the children until his release from jail.
{¶33} The father stated that he recently obtained a two-bedroom house and has lived there for the past two months. He recognized that the agency stated it was unable to verify his residence. The father explained, however, that he gave them the incorrect address because he "didn't feel safe." He also stated that he gave the agency the wrong address because he mixed up the numbers and he had not "mean[t] to do that."
{¶34} The father related that he stopped attending counseling sessions with Smith because he lost his medical card and he could not afford to pay the cost of counseling. He explained that he did, however, begin seeing a "Sensei" and meditates twice a day for two hours at a time. The father believes meditating has helped him.
{¶35} The father admitted that some of the children were sexually molested. He found it "fair" to state that he did not adequately protect the children. The father testified that he believes he now can adequately provide for the children. The father proclaimed that he loves his children dearly and that he misses them.
{¶36} The trial court subsequently granted the agency permanent custody of the children. The court found that the children have been in the agency's temporary custody for more than twelve months of a consecutive twenty-two month period and that placing them in the agency's permanent custody is in their best interests.
II. ASSIGNMENTS OF ERROR
{¶37} The father raises three assignments of error:
First Assignment of Error:
*915 The trial court was required to inquire into whether to appoint independent counsel for BJL, Jr.
Second Assignment of Error:
The trial court committed structural error by not inquiring into whether to appoint counsel for BJL, Jr.
Third Assignment of Error:
Children services failed to establish, by clear and convincing evidence, that it should be given permanent custody of BJL, Jr, BXL, and JML.
III. ANALYSIS
A. First and Second Assignments of Error
{¶38} Appellant's first and second assignments of error raise related issues. We therefore consider them together.
{¶39} In his first assignment of error, the father argues that the trial court plainly erred by failing to inquire whether to appoint independent counsel for B.J.L., Jr. The father claims that the child's wishes conflicted with the guardian ad litem's recommendation and that this conflict required the court to inquire whether to appoint separate counsel for B.J.L., Jr.
{¶40} In his second assignment of error, the father contends that the trial court's failure to inquire sua sponte whether to appoint counsel for the child amounts to structural error that mandates a reversal.
{¶41} We first disagree with the father that the trial court's failure to inquire whether to appoint counsel for the child when no one requested the court to do so amounts to structural error. The Ohio Supreme Court has not recognized the alleged error as structural. In fact, the Ohio Supreme Court has applied the plain-error rule to claims regarding the appointment of independent counsel for a child in a dependency proceeding. In re C.B. , 129 Ohio St.3d 231, 2011-Ohio-2899, 951 N.E.2d 398, ¶ 18 ; accord In re L.W. , 10th Dist. Franklin No. 17AP-586, 2018-Ohio-2099, 2018 WL 2460010, ¶ 36. In C.B. , the court noted that none of the parties requested the trial court to appoint independent counsel for the child and that the trial court thus "never had occasion to rule on this issue." Id. Although the C.B. court reviewed whether the record showed that the trial court should have appointed independent counsel for the child, it ultimately held that "the issue is not properly before this court," and the court "decline[d] to consider this matter in the first instance." Id.
{¶42} Here, we could overrule the father's first and second assignments of error based upon the C.B. court's reasoning that a party must request the trial court, in the first instance, to appoint counsel for the child before a reviewing court will consider the issue. We nevertheless may review the father's assignment of error for plain error. See Risner v. Ohio Dept. of Natural Resources, Ohio Div. of Wildlife , 144 Ohio St.3d 278, 2015-Ohio-3731, 42 N.E.3d 718, ¶ 27 (stating that reviewing court has discretion to consider forfeited constitutional challenges).
{¶43} Before a reviewing court may consider recognizing plain error, the party claiming error must establish (1) that " 'an error, i.e., a deviation from a legal rule' " occurred, (2) that the error was " 'an "obvious" defect in the trial proceedings,' " and (3) that this obvious error affected substantial rights, i.e., the error " 'must have affected the outcome of the trial.' " State v. Rogers , 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 22, quoting State v. Barnes , 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002) ; Schade v. Carnegie Body Co. , 70 Ohio St.2d 207, 209, 436 N.E.2d 1001 (1982) ("A 'plain error' is *916 obvious and prejudicial although neither objected to nor affirmatively waived which, if permitted, would have a material adverse affect on the character and public confidence in judicial proceedings.").
{¶44} The plain error doctrine is not, however, readily invoked in civil cases. Instead, an appellate court "must proceed with the utmost caution" when applying the plain error doctrine in civil cases. Goldfuss v. Davidson , 79 Ohio St.3d 116, 121, 679 N.E.2d 1099 (1997). The Ohio Supreme Court has set a "very high standard" for invoking the plain error doctrine in a civil case. Perez v. Falls Fin., Inc. , 87 Ohio St.3d 371, 375, 721 N.E.2d 47 (2000). Thus, "the doctrine is sharply limited to the extremely rare case involving exceptional circumstances where the error, left unobjected to at the trial court, rises to the level of challenging the legitimacy of the underlying judicial process itself." (Emphasis sic.) Goldfuss at 122, 679 N.E.2d 1099 ; accord Gable v. Gates Mills , 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 43. Moreover, appellate courts " 'should be hesitant to decide [forfeited errors] for the reason that justice is far better served when it has the benefit of briefing, arguing, and lower court consideration before making a final determination.' " Risner at ¶ 28, quoting Sizemore v. Smith , 6 Ohio St.3d 330, 332, 453 N.E.2d 632 (1983), fn. 2.
{¶45} In the case at bar, as we explain below, we do not believe that the trial court committed an error, obvious or otherwise, by failing to appoint-or by failing to inquire whether to appoint-independent counsel for the child.
{¶46} "[A] child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." In re Williams , 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, syllabus, citing R.C. 2151.352, Juv.R. 4(A), and Juv.R. 2(Y). Williams does not mandate that a child always have independent counsel in a juvenile court proceeding to terminate parental rights. Instead, a child is entitled to independent counsel in a termination of parental rights proceeding only when "certain circumstances" exist.
{¶47} The Williams court did not explicitly explain the "certain circumstances" that would warrant the appointment of independent counsel. Instead, the court offered the following guidance for juvenile courts to follow when ascertaining if "certain circumstances" exist: "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the guardian ad litem being appointed to represent the child." Id. at ¶ 17. Furthermore, a juvenile court must appoint independent counsel for a child "when a guardian ad litem who is also appointed as the juvenile's attorney recommends a disposition that conflicts with the juvenile's wishes." Id. at ¶ 18.
{¶48} Consequently, a trial court ordinarily should appoint independent counsel for a child " 'when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's recommendations.' " In re V.L. , 12th Dist. Butler No. CA2016-03-045, 2016-Ohio-4898, 2016 WL 3654502, ¶ 39, quoting In re B.K. , 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, 2011 WL 3891495, ¶ 19 ; accord In re Hilyard , 4th Dist. Vinton Nos. 05CA600 through 05CA609, 2006-Ohio-1965, 2006 WL 1045495, ¶ 36. However, a trial court generally need not " 'consider the appointment of counsel based upon a child's occasional expression of a wish to *917 be with a parent or because of a statement made by an immature child.' " In re N.P. , 2016-Ohio-3125, 65 N.E.3d 319 (11th Dist.), ¶ 14, quoting In re Williams , 11th Dist. Geauga Nos. 2002-G-2454, 2002-Ohio-6588, 2002 WL 31716777, ¶ 24 ; accord In re E.S. , 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, 2017 WL 275893, ¶ 49.
{¶49} In the case at bar, "certain circumstances" do not exist. The record does not show that B.J.L., Jr. consistently and repeatedly expressed a clear desire to live with his parents or otherwise expressed a desire that actually conflicted with the guardian ad litem's recommendation. Rather, the record shows that on one occasion, B.J.L., Jr. equivocated when discussing whether he wished to live with his parents. During a conversation with the guardian ad litem, B.J.L., Jr. "made it very clear that [he does] love [his] parents" and he "wanted to live with his parents because [he] loves [his] parents." However, during that same conversation, B.J.L., Jr. also stated that he "want[s] to live in the foster home." B.J.L., Jr. agreed that the foster parents "took better care" of him. B.J.L., Jr., additionally indicated that he likes the bicycle that he has at the foster home. The guardian ad litem stated that B.J.L., Jr. would like "to live [at] both places." B.J.L., Jr.'s statements do not show that he consistently and repeatedly expressed a desire that conflicted with the guardian ad litem's recommendation. See In re V.L. at ¶ 43 (concluding that foster mother's testimony that child talked about returning home, and caseworker's statement that early in the case, child asked "a lot" when she was going home to her parents did not show that child "consistently and repeatedly" expressed a strong desire that conflicted with guardian ad litem's recommendation). Instead, B.J.L., Jr. made inconsistent statements on one occasion.
{¶50} The guardian ad litem's testimony further suggests that B.J.L., Jr., may not possess the maturity to accurately convey his wishes. The guardian ad litem explained that the conversation occurred with B.J.L., Jr.'s older half-sibling (who is not part of this appeal) present. The guardian ad litem thought that "at least [the older half-sibling] understands what's going on." While the guardian ad litem did not expressly testify that B.J.L., Jr. lacks sufficient maturity to express his wishes, that conclusion seems implicit in the guardian ad litem's statement that "at least [the older-sibling] understands what's going on."
{¶51} Additionally, when the guardian ad litem talked to B.J.L., Jr. about his wishes, the child was not quite eight years of age. Thus, given B.J.L., Jr.'s inconsistent expression of where he would like to live, the guardian ad litem's suggestion that B.J.L., Jr. may not fully comprehend the process, and B.J.L., Jr.'s age, we do not believe that the trial court erred by failing to inquire sua sponte whether to appoint separate counsel for B.J.L., Jr., or that the court erred by failing to appoint separate counsel for B.J.L., Jr.
{¶52} Moreover, the case that the father cites to support his proposition that the trial court was required to inquire sua sponte whether to appoint independent counsel, In re Emery , 4th Dist. Lawrence No. 02CA40, 2003-Ohio-2206, 2003 WL 2003811, pre-dates the Ohio Supreme Court's decision recognizing that a child might be entitled to independent counsel in certain circumstances. In re Williams , supra . The Williams court did not indicate that a trial court has a mandatory duty to inquire whether to appoint independent counsel for a child when no one requests that it do so and that the failure to inquire mandates a reversal on appeal. Indeed, the Williams court declined discretionary review *918 of the court of appeals holding that " 'when a child consistently expresses a desire to be with a parent, then a juvenile court should investigate, giving due regard to the child's maturity and understanding of the proceedings, and make a ruling about whether an attorney should be appointed to represent the child's interest and expressed wishes.' " Id. at ¶ 6, quoting Williams I , 2002-Ohio-6588, at ¶ 26. Emery also pre-dates C.B. , supra , which stated that the failure to request the trial court to appoint independent counsel effectively forfeits any error for purposes of appeal.
{¶53} Furthermore, any mandatory duty to investigate that might exist arises " 'when a child consistently expresses a desire to be with a parent.' " Williams at ¶ 6, quoting Williams I , 2002-Ohio-6588, at ¶ 26. As we determined above, the child did not consistently express a desire to be with a parent. Thus, even if trial courts have a mandatory duty to investigate when a child consistently expresses a desire to be with a parent, that circumstance does not exist in the case at bar.
{¶54} Accordingly, based upon the foregoing reasons, we overrule the father's first and second assignments of error.
B. Third Assignment of Error
{¶55} In his third assignment of error, the father essentially argues that the trial court's best-interest determination is against the manifest weight of the evidence. The father asserts that the evidence shows that he shares an undeniable bond with his children and that this bond establishes that placing the children in the agency's permanent custody is not in their best interest.
1. Standard of Review
{¶56} A reviewing court generally will not disturb a trial court's permanent custody decision unless the decision is against the manifest weight of the evidence. In re R.M. , 2013-Ohio-3588, 997 N.E.2d 169, ¶ 53 (4th Dist.). When an appellate court reviews whether a trial court's permanent custody decision is against the manifest weight of the evidence, the court " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " Eastley v. Volkman , 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting Tewarson v. Simon , 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001), quoting State v. Thompkins , 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting State v. Martin , 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).
{¶57} In a permanent custody case, the ultimate question for a reviewing court is "whether the juvenile court's findings * * * were supported by clear and convincing evidence." In re K.H. , 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43. In determining whether a trial court based its decision upon clear and convincing evidence, "a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof." State v. Schiebel , 55 Ohio St.3d 71, 74, 564 N.E.2d 54 (1990). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." R.M. at ¶ 55.
{¶58} Once the reviewing court finishes its examination, the court may reverse the judgment only if it appears *919 that the fact-finder, when resolving the conflicts in evidence, " 'clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.' " Thompkins at 387, 678 N.E.2d 541, quoting Martin at 175, 485 N.E.2d 717. A reviewing court should find a trial court's permanent custody decision against the manifest weight of the evidence only in the " 'exceptional case in which the evidence weighs heavily against the [decision].' " Id. , quoting Martin at 175, 485 N.E.2d 717.
2. Permanent Custody Principles
{¶59} A parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. Santosky v. Kramer , 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ; In re Murray , 52 Ohio St.3d 155, 157, 556 N.E.2d 1169 (1990) ; accord In re D.A. , 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶¶ 8-9. A parent's rights, however, are not absolute. D.A. at ¶ 11. Rather, " 'it is plain that the natural rights of a parent * * * are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " In re Cunningham , 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting In re R.J.C. , 300 So.2d 54, 58 (Fla.App.1974). Thus, the State may terminate parental rights when a child's best interest demands such termination. D.A. at ¶ 11.
3. Permanent Custody Framework
{¶60} A children services agency may obtain permanent custody of a child by (1) requesting it in the abuse, neglect or dependency complaint under R.C. 2151.353, or (2) filing a motion under R.C. 2151.413 after obtaining temporary custody. In this case, the agency sought permanent custody of the children by filing a motion under R.C. 2151.413. When an agency files a permanent custody motion under R.C. 2151.413, R.C. 2151.414 applies. R.C. 2151.414(A).
{¶61} R.C. 2151.414(B)(1) specifies that a trial court may grant a children services agency permanent custody of a child if the court finds, by clear and convincing evidence, that (1) the child's best interest would be served by the award of permanent custody, and (2) any of the following conditions applies:
(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
(b) The child is abandoned.
(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month *920 period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.
(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.
a. R.C. 2151.414(B)(1)(d)
{¶62} In the case at bar, the trial court found that the children have been in the agency's temporary custody for more than twelve months of a consecutive twenty-two month period, and thus, that R.C. 2151.414(B)(1)(d) applies. The father does not challenge the trial court's R.C. 2151.414(B)(1)(d) finding. Therefore, we do not address it.
b. Best Interest Factors
{¶63} R.C. 2151.414(D)(1) requires a trial court to consider all relevant, as well as specific, factors to determine whether a child's best interest will be served by granting a children services agency permanent custody. The specific factors include: (1) the child's interaction and interrelationship with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the child's wishes, as expressed directly by the child or through the child's guardian ad litem, with due regard for the child's maturity; (3) the child's custodial history; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any factors listed under R.C. 2151.414(E)(7) to (11) apply.
{¶64} Determining whether granting permanent custody to a children services agency will promote a child's best interest involves a delicate balancing of "all relevant [best interest] factors," as well as the "five enumerated statutory factors." In re C.F. , 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57, citing In re Schaefer , 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56 ; accord In re C.G. , 9th Dist. Summit Nos. 24097 and 24099, 2008-Ohio-3773, 2008 WL 2906526, ¶ 28 ; In re N.W. , 10th Dist. Franklin Nos. 07AP-590 and 07AP-591, 2008-Ohio-297, 2008 WL 224356, ¶ 19. However, none of the best interest factors requires a court to give it "greater weight or heightened significance." C.F. at ¶ 57. Instead, the trial court considers the totality of the circumstances when making its best interest determination. In re K.M.S. , 3d Dist. Marion Nos. 9-15-37, 9-15-38, and 9-15-39, 2017-Ohio-142, 2017 WL 168864, ¶ 24 ; In re A.C. , 9th Dist. Summit No. 27328, 2014-Ohio-4918, 2014 WL 5690571, ¶ 46. In general, "[a] child's best interest is served by placing the child in a permanent situation that fosters growth, stability, and security." In re C.B.C. , 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, 2016 WL 915012, ¶ 66, citing In re Adoption of Ridenour , 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991).
i. Interactions and Interrelationships
{¶65} The father dearly loves his children, and the children love him. The agency did not express any concerns regarding the father's interactions with the children during the times that he visited. Additionally, he religiously called the children every Sunday evening, promptly at 6:00.
{¶66} Unfortunately, the father did not consistently visit the children. The father, however, testified that the long distance he *921 had to travel to visit the children, coupled with his debilitating pain, often made visiting the children difficult.
{¶67} Still, the evidence also shows that before the agency became involved, the father essentially abandoned the children in what the father believed to be a drug kingpin's house (i.e., the maternal grandfather's house). The father stated that he wanted to take the children with him, but that he could not because three people were pointing weapons at him. Even if the trial court believed this part of the father's testimony, the evidence shows that the father subsequently did nothing to attempt to remove the children from the household. The father also admitted that he did not adequately protect the children from being sexually molested. Thus, although familial love may be evident, the evidence does not show that the father's interrelationship with the children produced positive outcomes for the children.
{¶68} Furthermore, we recognize that family unity and blood relationship may be "important factors" to consider, but neither is controlling. In re J.B. , 8th Dist. Cuyahoga Nos. 98518 and 98519, 2013-Ohio-1703, 2013 WL 1799681, ¶ 31. Indeed, "neglected and dependent children are entitled to stable, secure, nurturing and permanent homes in the near term * * * and their best interest is the pivotal factor in permanency case." In re T.S. , 8th Dist. Cuyahoga No. 92816, 2009-Ohio-5496, 2009 WL 3321019, ¶ 35. Thus, while biological relationships may be important considerations, they are not controlling when ascertaining a child's best interest. In re J.B. , 8th Dist. Cuyahoga Nos. 98566 and 98567, 2013-Ohio-1706, 2013 WL 1799853, ¶ 163 ; accord In re J.F. , 2018-Ohio-96, 102 N.E.3d 1264, ¶ 65 (8th Dist.) (stating that the "existence of a positive relationship," by itself, is not determinative of the child's best interest); In re S.S.-1 , 4th Dist. Athens No. 17CA44, 2018-Ohio-1349, 2018 WL 1720650, ¶ 76.
ii. Children's Wishes
{¶69} The court noted that the guardian ad litem indicated that the two youngest children, J.M.L. and B.X.L., did not express their wishes and that the guardian ad litem recommended that the court grant the agency permanent custody of the two children.
{¶70} The court observed that B.J.L., Jr. stated that he wanted to live with both the foster parents and his parents. The court noted that the guardian ad litem recommended that the court grant the agency permanent custody of B.J.L., Jr.
iii. Custodial History
{¶71} The father lived with the children from the time they were born until June 2016, when the father left the children with their mother and maternal grandfather.
{¶72} Immediately before their October 2016 removal, the children lived with their maternal grandfather. The agency placed the children in the same foster home, where they remained throughout the proceedings.
{¶73} When the agency filed its permanent custody motion, the children had been in its temporary custody for approximately fifteen consecutive months. As of the date of the permanent custody hearing, the children had been in the agency's temporary custody for about twenty months.
iv. Legally Secure Permanent Placement
{¶74} "Although the Ohio Revised Code does not define the term, 'legally secure permanent placement,' this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met."
*922 In re M.B. , 4th Dist. Highland No. 15CA19, 2016-Ohio-793, 2016 WL 818754, ¶ 56, citing In re Dyal , 4th Dist. Hocking No. 01CA12, 2001 WL 925423, *9 (Aug. 9, 2001) (implying that "legally secure permanent placement" means a "stable, safe, and nurturing environment"); see also In re K.M. , 10th Dist. Franklin Nos. 15AP-64 and 15AP-66, 2015-Ohio-4682, 2015 WL 7079930, ¶ 28 (observing that legally secure permanent placement requires more than stable home and income but also requires environment that will provide for child's needs); In re J.H. , 11th Dist. Lake No. 2012-L-126, 2013-Ohio-1293, 2013 WL 1294646, ¶ 95 (stating that mother unable to provide legally secure permanent placement when she lacked physical and emotional stability and that father unable to do so when he lacked grasp of parenting concepts); In re J.W. , 171 Ohio App.3d 248, 2007-Ohio-2007, 870 N.E.2d 245, ¶ 34 (10th Dist.) (Sadler, J., dissenting) (stating that a legally secure permanent placement means "a placement that is stable and consistent"). Thus, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." M.B. at ¶ 56. Furthermore, a trial court that is evaluating a child's need for a legally secure permanent placement and whether the child can achieve that type of placement need not determine that terminating parental rights is "not only a necessary option, but also the only option." Schaefer , 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532 at ¶ 64. Rather, once the court finds the existence of any one of the R.C. 2151.414(B)(1)(a)-(e) factors, R.C. 2151.414(D)(1) requires the court to weigh "all the relevant factors * * * to find the best option for the child." Id.
{¶75} Here, the evidence in the record supports the trial court's finding that the children need a legally secure permanent placement and that they cannot achieve this type of placement without granting the agency permanent custody of the children. The father's actions throughout the entirety of the case sadly do not show that he is willing or able to provide the children with a safe, stable, and consistent environment.
{¶76} The father has not maintained stable housing for any significant length of time. The father testified that he recently obtained a two-bedroom home that he thinks would be adequate for the children. But the agency was unable to verify the father's new address. Moreover, the father's past history shows that he rarely maintains the same residence for any length of time. Before obtaining his current residence, the father did not have a stable residence. Instead, he lived with family or with his girlfriend. Furthermore, the father reported that he was homeless in January 2018. Thus, throughout the approximately year and one-half that the case was pending, the father had not demonstrated that he would maintain a stable and permanent home for the children.
{¶77} The father also did not fully address the agency's mental health and substance abuse concerns. The father initially attended counseling on a consistent basis, and his counselor stated that the father actively engaged in counseling. The counselor further testified that the father appeared motivated to reunite with his children. Unfortunately, the father's counseling efforts weakened as time passed. After his counselor began her maternity leave, the father had difficulty resuming counseling, even when his counselor returned from her six-week maternity leave. The agency's caseworker indicated that the father's mental health remains "a huge major" concern and that continued counseling thus is imperative.
*923 {¶78} Additionally, the father remains on probation and was involved in a domestic violence/assault incident with his ex-girlfriend. The father also admitted that some of the children were sexually molested. He found it "fair" to state that he did not adequately protect the children.
{¶79} Perhaps most tellingly and as we noted earlier, the father essentially abandoned the children in June 2016, when he left them with the mother and the maternal grandfather. After the father left, he took no action whatsoever to attempt to remove or protect the children from the environment that the father thought too harmful for himself. Instead, he allowed the children to languish in the household. Even if the father had been in jail for part of the time after he left the household, he still could have alerted the appropriate authorities to the harmful environment in which he left the children. While we do not doubt that the father loves his children and desperately wants to reunite with them, his actions regrettably do not show that he will provide the children with the legally secure permanent placement that their best interests demand.
{¶80} This court has recognized that a parent's past history is one of the best predictors of future behavior. In re West , 4th Dist. Athens No. 05CA4, 2005-Ohio-2977, 2005 WL 1400029, ¶ 28, citing In re A.S. , 12th Dist. Butler Nos. CA2004-07-182 and CA2004-08-185, 2004-Ohio-6323, 2004 WL 2698408, ¶ 37 ("Past history is often the best predictor of future conduct. While surely people can change, the facts do not indicate that [the biological parents] have the motivation or ability to follow through and do what is necessary to regain custody of their child."); In re Vaughn , 4th Dist. Adams No. 00CA692, 2000 WL 33226177, *7 (Dec. 6, 2000) ("To further the interests of the children, the court must consider any evidence available to it, including a parent's pattern of conduct. Some of the most reliable evidence for the court to consider is the past history of the children and the parents."); see also In re Brown , 60 Ohio App.3d 136, 139, 573 N.E.2d 1217 (1st Dist.1989) (stating that the mother's "past parenting history and her ability to comply with prior reunification plans regarding her other children were relevant considerations in the juvenile court's dispositional determination" to award a children services agency permanent custody).
{¶81} Here, the father's past behavior unfortunately documents that he failed to maintain any stable, consistent, and safe environment suitable for the children. While he claims that he now has a suitable residence, the agency was unable to verify the address. Even if, however, the father currently possesses a house with four walls, his children need more than a physical space. Instead, the children need an environment with a responsible adult who will ensure that the children's needs are met.
{¶82} Given the children's progress and stabilization while in the agency's temporary custody, the trial court could have quite reasonably decided not to experiment with their welfare by placing them with their father. We have repeatedly recognized that trial courts need not experiment with a child's welfare:
"* * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent]. * * * The law does not require the court to *924 experiment with the child's welfare to see if he will suffer great detriment or harm."
In re W.C.J. , 4th Dist. Jackson No. 14CA3, 2014-Ohio-5841, 2014 WL 7477958, ¶ 48, quoting In re Bishop , 36 Ohio App.3d 123, 126, 521 N.E.2d 838 (5th Dist.1987).
{¶83} Accordingly, based upon the foregoing reasons, we overrule the father's third assignment of error.
IV. Conclusion
{¶84} Having overruled all of the father's assignments of error, we affirm the trial court's judgment.
JUDGMENT AFFIRMED.
Abele, P.J. and McFarland, J.: Concur in Judgment and Opinion.

The mother is not involved in this appeal.