[Cite as *In re V.L.*, 2016-Ohio-4898.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

|                        |   |                                |
|------------------------|---|--------------------------------|
| IN RE:                 | : |                                |
|                        |   | CASE NOS. CA2016-03-045        |
| V.L., et al.           | : | CA2016-03-046                  |
|                        |   | CA2016-03-047                  |
|                        | : | CA2016-03-050                  |
|                        |   | CA2016-03-051                  |
|                        | : | CA2016-03-052                  |
|                        |   |                                |
|                        | : | O P I N I O N                  |
|                        |   | 7/8/2016                       |
|                        | : |                                |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2013-0498, JN2013-0499, JN2013-0500

Debra Rothstein, Legal Aid Society of Southwest Ohio, LLC, 10 Journal Square, 3rd Floor, Hamilton, Ohio 45011, guardian ad litem

Jeannine C. Barbeau, 3268 Jefferson Avenue, Cincinnati, Ohio 45220, for appellant, K.L.

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Department of Job & Family Services

Kim Schneider, 8080 Beckett Center Drive, Suite 112, West Chester, Ohio 45069, for appellant, B.A.

**PIPER, P.J.**

{¶ 1} Appellants, B.A. ("Mother") and K.L. ("Father"), appeal from the judgment of the

Butler County Court of Common Pleas, Juvenile Division, awarding permanent custody of

their children to the Butler County Department of Job and Family Services ("BCDJFS" or "the agency"). For the reasons that follow, we affirm the judgment of the juvenile court.

{¶ 2} Mother and Father, who have never married nor resided together, have three minor children, V.L., S.L., and W.L. Mother and Father stipulated to the following facts that occurred between June 1, 2013 and October 3, 2013, for purposes of the permanent custody hearing.

{¶ 3} On June 1, 2013, Butler County Children Services ("BCCS") received a referral alleging that V.L. had head lice and that the children's home was in deplorable condition with animal feces throughout the residence. BCCS observed the floors in the home were dirty and littered with food, trash, clothes, blankets, and pop cans. The children were very dirty, and ate on the floor, because there was minimal furniture.

{¶ 4} On July 1, 2013, BCCS determined that the condition of the children's home indicated neglect. BCCS provided the family with four beds and mattresses. However, Mother left the beds and mattresses on the back porch and did not use them for the children. Mother did agree to participate in the Development of Living Skills ("D.L.S.") program, which she began on August 15, 2013. She participated in one initial appointment and two other parenting education appointments. However, D.L.S. subsequently indicated its intention to terminate its involvement due to Mother's noncompliance.

{¶ 5} V.L. has been diagnosed with "mixed receptive expressive disorder," "chromosome anomaly," and epilepsy. The child has been prescribed Vimpat, which is a medication prescribed for individuals with epilepsy when seizing. The child is eligible for services through the Family Support Program through Butler County Developmental Disabilities. Mother participated in an intake assessment, but did not follow through with the recommended services for V.L. On September 6, 2013, V.L. was sent home from school after she fell and hit her head. Mother did not seek medical attention for V.L. until BCCS and

a representative of D.L.S. required Mother to contact 911, in order to have the child examined.

{¶ 6} On September 16, 2013, BCCS received a report from the Middletown Police Department stating that it had observed Mother's home to be in deplorable condition and nearly unlivable, since there was animal feces scattered throughout the home and food left out. Mother became unable to reside in her home when her electricity was shut off. Mother's electric bill is approximately $2,300. On September 18, 2013, BCCS located Mother and her three children at the home of Mother's sister. They had been residing there because Mother's home was without electricity.

{¶ 7} On October 1, 2013, BCCS received a report that Mother had been arrested for failure to appear on a truancy charge and that the children were residing with Father at a residence where people used heroin.

{¶ 8} On October 2, 2013, Father and the children were observed at the residence of Louis Martin. The children had extremely dirty faces and were wearing dirty clothing. W.L. was seen climbing out a window and running away from the home. V.L. and S.L. were not sent to school that day because, according to Father, he had overslept. Lois Martin resides in a one-bedroom duplex where there are two adults and three children already residing in the home.[1]

{¶ 9} Also on October 2, 2013, Father submitted to an oral drug screen and tested positive for cocaine as well as marijuana, and Mother was released from the Butler County Jail.

{¶ 10} As of October 3, 2013, V.L. had missed 23 days of school and S.L. had

---

1. The information in this paragraph is taken from the facts to which Mother and Father stipulated for purposes of the permanent custody hearing. It is not clear from these stipulated facts whether the "Louis Martin" and "Lois Martin" referred to in this paragraph are two different persons or the same person, with use of the name "Louis" simply resulting from a typographical error. In any event, the confusion on this point does not affect our decision.

missed 15 days of school, even though only 36 days of the school year had elapsed as of that date. V.L. is on an Individualized Education Program ("I.E.P."), administered through her school for treatment of cognitive delays, speech services, and physical therapy services. V.L. does not receive these services when she is not in school.

{¶ 11} On October 3, 2013, BCCS made contact with Mother, and it was reported that Mother had not been sending V.L. and S.L. to school because they had head lice. Mother reported she was residing with her sister and the children were residing with Father in the home of Ms. Martin.

{¶ 12} On October 4, 2013, BCDJFS filed complaints, alleging the children were neglected or dependent and requesting the juvenile court grant temporary custody of the children to the agency. On October 17, 2013, the juvenile court appointed attorney Meredith Schnug to act as both the guardian ad litem ("GAL") and attorney for the children. Attorney Schnug subsequently withdrew from the case and was replaced by attorney Debra Rothstein, who was appointed to act as both the GAL and attorney for the children.

{¶ 13} Mother and Father were each given a case plan by the agency. Mother's case plan required her to provide a safe and secure environment for the children, meet the children's needs on a consistent basis, submit to a substance abuse and mental illness assessment and follow all recommendations, improve sanitation in her residence, and engage in parenting education services. Father's case plan required him to undergo a substance abuse and mental illness assessment, and to obtain and maintain safe and stable housing and the financial means to provide for the children.

{¶ 14} On November 4, 2013, the juvenile court adjudicated the children dependent and neglected and granted BCDJFS temporary custody of the children. The agency placed the children in foster care, where they have remained ever since.

{¶ 15} On April 2, 2015, BCDJFS moved for permanent custody of the children. A

permanent custody hearing was held on June 30, 2015 and November 5, 9, and 10, 2015. The witnesses who testified at the hearing included Mother, Father, the children's foster mother, and the two BCCS caseworkers who handled the family's case, namely, Michael Hill, who managed the case from its inception in June 2013 until February 2014, and Sachi Slater, who managed the case from the time Hill left in February 2014 until the date of the permanent custody hearing. Two days after the permanent custody hearing concluded, the GAL issued her report recommending that the agency be awarded permanent custody.

{¶ 16} On November 30, 2015, the magistrate issued a decision recommending that Mother's and Father's parental rights be terminated and that BCDJFS be awarded permanent custody. Mother and Father filed objections to the magistrate's decision. After a hearing, the juvenile court overruled the objections and adopted the magistrate's decision as the final order of the court.

{¶ 17} Mother now appeals from the judgment of the juvenile court, and assigns the following as error:

{¶ 18} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANENT CUSTODY OF S.L., W.L., AND V.L. TO THE BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS NOT SUPPORTED BY SUFFICIENT, CREDIBLE EVIDENCE AND WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 19} Father appeals from the same judgment, and assigns the following as error:

{¶ 20} Assignment of Error No. 1:

{¶ 21} THE TRIAL COURT'S DECISION AND ORDER GRANTING PERMANENT CUSTODY OF W.L., S.L., AND V.L. TO BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT CLEAR AND CONVINCING EVIDENCE TO SUPPORT THE TRIAL COURT'S FINDINGS.

**{¶ 22}** Assignment of Error No. 2:

**{¶ 23}** THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE CHILDREN, W.L., S.L., AND V.L., TO BUTLER COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES IS NOT IN THE BEST INTEREST OF THE CHILDREN WHEN THE FAMILY IS STRONGLY BONDED AND THE CHILDREN ARE NOT IN AN ADOPTIVE HOME; AND THERE WAS A CONFLICT IN THE ROLE OF THEIR ATTORNEY/GAL [SIC].

**{¶ 24}** We shall address Mother's and Father's assignments of error together, since the arguments raised therein are similar and interrelated.

**{¶ 25}** Mother and Father both argue the juvenile court's decision to award BCDJFS permanent custody was not supported by sufficient, clear and convincing evidence, and was against the manifest weight of the evidence. Father also argues the juvenile court erred by not appointing a separate attorney to represent the children because, "[t]he children have consistently and repeatedly stated that they wish to be reunified with their parents and return to their family."

**{¶ 26}** Before a natural parent's constitutionally protected liberty interest in the care and custody of his or her child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met. *Santosky v. Kramer,* 455 U.S. 745, 759, 102 S.Ct. 1388 (1982). Clear and convincing evidence is that which will produce in the trier-of-fact's mind a firm belief or conviction as to the facts sought to be established. *Cross v. Ledford,* 161 Ohio St. 469, 477 (1954). An appellate court's review of a juvenile court's decision granting permanent custody is limited to determining whether the decision is supported by sufficient credible evidence. *In re M.H.,* 12th Dist. Fayette No. CA2012-11-035, 2013-Ohio-1063, ¶ 16. A reviewing court will reverse a finding by the juvenile court that the evidence was clear and convincing only if there is a sufficient conflict in the evidence presented. *Id.,* citing *In re Rodgers*, 138 Ohio App.3d 510,

520 (12th Dist.2000).

{¶ 27} Pursuant to R.C. 2151.414(B)(1), a court may terminate parental rights and award permanent custody to a children services agency if it makes findings pursuant to a two-part test. First, the court must find that the grant of permanent custody to the agency is in the best interest of the child, utilizing the factors of R.C. 2151.414(D)(1) and any other relevant factor. Second, the court must find that one of the circumstances listed in R.C. 2151.414(B)(1)(a)-(e) applies, including that the child has been in the temporary custody of the children services agency for at least 12 months of a consecutive 22-month period. R.C. 2151.414(B)(1)(d).

{¶ 28} The juvenile court found by clear and convincing evidence that the children have been in the temporary custody of BCDJFS for more than 12 months of consecutive 22-month period as of the date the agency filed its motion for permanent custody, and Mother and Father do not dispute this finding. However, Mother and Father argue the juvenile court erred in determining that awarding the agency permanent custody is in the children's best interest.

{¶ 29} R.C. 2151.414(D)(1) provides, in pertinent part, as follows:

> In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the

child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 30} The only best-interest factors disputed in this case are R.C. 2151.414(D)(1)(a), (b), and (d).[2]

## R.C. 2151.414(D)(1)(a)

{¶ 31} As to the children's interaction and interrelationship with their parents, siblings, foster caregivers, and any other person who may significantly affect them, Mother and Father both contend the evidence in the record shows there is a strong bond between them and their children, they love their children very much and their children love them very much in return, and they visited their children regularly throughout this case. Both parents also point out the children's foster mother has acknowledged she cannot adopt the children because of her age, and Mother contends that, as a result, the children will have to be moved to yet another home, to live with caregivers who they have never met, and without a guarantee they will be permitted to stay together.

{¶ 32} The record shows that both Mother and Father have participated in supervised visits with the children since the inception of this case and those visits have been, for the

---

2. The best-interest factor in R.C. 2151.414(D)(1)(c) is not in dispute, as Mother and Father acknowledge the children have been in the temporary custody of BCDJFS for 12 or more months of a consecutive 22-month period. The best-interest factor in R.C. 2151.414(D)(1)(e) is not in dispute either, as the juvenile court determined there is nothing in the record to show that any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and children in this case, and neither Mother nor Father assert otherwise.

most part, positive. There is a bond between the parents and the children. Indeed, for a brief period in late 2014, Mother's visits were moved to an unsupervised status. However, that ended when the heat to Mother's home was cut off due to her failure to pay her utilities. The parents' visits with the children could not be extended subsequent to that time, because both parents have been, for the most part, homeless. Additionally, caseworker Slater testified that the staff at the visitation center where the parents' weekly supervised visits with the children take place officially designated the staff's level of supervision of the family during visitation is "mostly observational" where the staff checks on the family only "occasionally." However, caseworker Slater testified that she has received reports from the visitation center that its staff treats Mother and Father and the children at a higher level of observation in order "to maintain the needs of the family and ensure the safety of the children."

{¶ 33} The evidence in the record also supports the juvenile court's determination that the children are challenging to control and supervise and that both Mother and Father had failed consistently control and supervise the children. V.L. has significant issues regarding her health and mental development, S.L. seeks attention, and W.L. can be aggressive. Both parents had to be assisted by the staff of the visitation center when the children's behaviors escalated significantly or escaped the parents' attention. Furthermore, while the children have been in foster care since the inception of this case in late 2013, the parents became more inconsistent in exercising visitation in 2015. Caseworker Slater testified at the permanent custody hearing that, "[j]ust recently," the children have begun exhibiting more temper tantrums and aggression towards each other, resulting in the agency referring the children to counseling.

{¶ 34} Foster mother testified that when the children were first brought to her, they were quite difficult to handle due to their behavior. According to foster mother, the children were "wild" and would run and climb on anything, and none of the children appeared to have

any knowledge about personal hygiene.  Foster mother testified that, since being placed in her care, the children's collective behavior has improved and that the children have developed a close bond with their foster family.  Caseworker Slater testified that the children are "very comfortable" in their foster home and are "strongly bonded" with the foster parents and the other foster children in the home.

{¶ 35}  However, foster mother, who was 71 years old at the time of the permanent custody hearing, testified that while she would love to adopt the children, she would not be able to do so due to her age and her belief that the children needed someone who was younger.

### R.C. 2151.414(D)(1)(b)

{¶ 36}  As to the children's wishes, as expressed directly by them to the court or through their GAL, with due regard for the children's maturity, the magistrate stated in his decision that while he "did not interview the children," the children's "wishes were incorporated in the report of the GAL[,]" and "[t]he GAL recommends granting the motion [for permanent custody] filed by the BCDJFS."[3]

{¶ 37}  Father observes that Rule 48(D)(8) of the Supreme Court Rules of Superintendence for the Courts of Ohio for guardians ad litem provides that "[w]hen a guardian ad litem determines that a conflict exists between the child's best interest and the child's wishes, the guardian ad litem shall, at the earliest practical time, request in writing that the court promptly resolve the conflict by entering appropriate orders."  Father also notes that in *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, ¶ 29, the court stated that, "[p]ursuant

---

3. While the magistrate represented in his decision that the children's "wishes were incorporated in the report of the GAL[,]" a review of the GAL's report shows the GAL failed to state whether she ever actually interviewed the children, and, if so, what the children's wishes were, and if not, the reason why she chose not to interview the children about their wishes regarding custody.  However, neither Mother nor Father has raised this as an issue on appeal.

to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances."

{¶ 38} Continuing, Father contends the children "have consistently and repeatedly stated that they wish to be reunified with their parents and return to their family[,]" and therefore, there was a conflict between the children's wishes and what the GAL had determined was in the children's best interest (i.e., awarding the agency permanent custody). Thus, Father asserts, the juvenile court "erred in failing to appoint a separate Attorney to represent the wishes of the children."

{¶ 39} In *In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 19, this court stated, as follows:

> Generally, when an attorney is appointed as guardian ad litem, as is the case here, "that attorney may also act as counsel for the child, absent a conflict of interest." *In re Holt,* Franklin App. No. 03AP-355, 2003-Ohio-5580, ¶ 20. In other words, because the guardian ad litem is permitted to maintain dual roles in a custody dispute, "a court is not required to appoint separate counsel unless the [guardian ad litem's] recommendations regarding their best interest conflict with the children's wishes." *In re J.M.,* 2009-Ohio-4824 at ¶ 52, citing *In re Williams,* 101 Ohio St.3d 398, 2004-Ohio-1500; see, also, Juv.R.4(C); R.C. 2151.281(H). In determining whether a conflict exists, "courts should make a determination, on a case-by-case basis, whether the child actually needs independent counsel, taking into account the maturity of the child and the possibility of the child's guardian ad litem being appointed to represent the child." *In re J.P.-M.,* Summit App. No. 23694, 23714, 2007-Ohio-5412, ¶ 53, quoting *Williams* at ¶ 17. Such appointment may be necessary when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's recommendations. See *In re Wylie,* Greene App. No. 2004CA0054, 2004-Ohio-7243, ¶ 73; *In re Hilyard,* Vinton App. Nos. 05CA600-604, 05CA606-6009, 2006-Ohio-1965, ¶ 37; *In re J.B.,* Summit App. No. 23436, 2007-Ohio-620, ¶ 22; *In re K.K. & D.C.,* Licking App. No. 09-CA-93, 2009-Ohio-5887, ¶ 15.

{¶ 40} The state alleges that Father's claim that the children "have consistently and repeatedly stated that they wish to be reunified with their parents and return to their family"

"rings hollow" since Father has failed to cite any evidence in the record to support this claim. The state points out that when the children's foster mother was asked if any of the children have expressed a desire to be reunited with their parents, she testified that S.L. was the only one of the three children who talked about returning to Mother and "all she's going to get [from Mother] when she gets home," including "her own bathroom and bedroom, [and] a pet." The state contends, however, that foster mother's testimony "does not constitute evidence of a consistent and repeated expression regarding reunification, meaning the record supports the juvenile court's analysis of this factor."

{¶ 41} The state is correct that Father did not cite any evidence in the record to support his claim that the children consistently and repeatedly stated that they wished to be reunified with Mother and Father. This court has reviewed the voluminous record in this case, and we have found no evidence that either V.L. or W.L. consistently and repeatedly expressed a strong desire to return to their parents, as Father contends.

{¶ 42} There is some evidence that S.L. indicated a desire to be reunited with her parents. In addition to foster mother's testimony above that S.L. was the only one of the three children who talked about returning home, the family's first case worker, Hill, testified that, early in the case, S.L. "did ask me a lot * * * when she [was] going home to her parents." Thus, there is some evidence in the record showing that at least one of the three children indicated that she wished to be reunified with her parents.

{¶ 43} However, the foster mother's testimony that S.L. talked about returning home, and the caseworker's statement that early in the case, S.L. asked "a lot" when she was going home to her parents does not rise to the level of "consistently and repeatedly" expressing a strong desire that is different from the GAL's recommendations. Accordingly, there was no error in the juvenile court's failure to appoint a separate attorney to represent the wishes of the children.

**{¶ 44}** Moreover, neither Mother nor Father objected to the magistrate's decision on the basis that the children's GAL and attorney had a conflict of interest that would warrant appointing all or any of the children independent counsel. Consequently, Mother and Father waived all but plain error on this issue. See Juv.R. 40(D)(3)(b)(ii) (an objection to a magistrate's decision must be specific and state with particularity all grounds for the objection) and Juv.R. 40(D)(3)(b)(iv) (except for a claim of plain error, a party is not permitted to assign as error on appeal the court's adoption of any factual finding or legal conclusion unless the party has objected to that finding or conclusion as required by Juv.R. 40[D][3][b]).

**{¶ 45}** With regard to the children's wishes concerning custody, the GAL did not state in her report and recommendation whether she actually interviewed the children regarding their wishes concerning custody. However, we believe the record in this case shows that it is likely that the GAL either did not interview the children or accorded their wishes regarding custody much significance as a result of the level of the children's maturity.

**{¶ 46}** V.L., who is the eldest child, turned nine years old by the time of the final three days of the four-day permanent custody hearing. V.L. has an I.Q. that is reportedly in the impaired range, is in a special needs class and is on an I.E.P. Mother testified that V.L.'s physician told her that V.L.'s mind works like that of a child who is half V.L.'s age, meaning that V.L. is like a four and one-half year old. Additionally, V.L. has significant health problems.

**{¶ 47}** W.L., who is the youngest child, was approximately six and one-half years old at the conclusion of the permanent custody hearing. W.L. had to repeat preschool and is currently on an I.E.P. for speech. Caseworker Slater considered W.L. to be too young to have a psychological evaluation performed on him.

**{¶ 48}** S.L., who was approximately seven years and ten months old at the conclusion of the permanent custody hearing, was determined to have an "average" intellect. However,

S.L. had to repeat first grade. S.L. is not currently on an I.E.P., but is being monitored for intervention needs. S.L. struggles with reading and writing. Further, S.L. has had particular problems with her emotions. S.L. ran away from her foster home briefly in 2014, and entered counseling much earlier than the other two children. When asked why S.L. began counseling earlier than the other two children, foster mother testified that it may have been S.L.'s anger. Foster mother explained that S.L. "tells little lies, she throws fits, so she cries a lot[,]" and when foster mother took S.L. to her room and told her to stay there until she stopped crying, S.L. would sometimes "tear everything off the beds."

### R.C. 2151.414(D)(1)(d)

{¶ 49} As to this factor, the evidence in the record overwhelmingly shows that these children are in great need of a legally secure placement given their age, various health problems and mental conditions, and level of maturity, and that such a legally secure placement cannot be achieved without awarding the agency permanent custody.

{¶ 50} The record shows that no appropriate relative has come forward to be considered as a placement option for the children and no motion for placement of the children with anyone other than a parent or BCDJFS has been filed.

{¶ 51} Mother contends that at the time of the permanent custody hearing, she was living in a "stable residence" with her cousin, was receiving Social Security benefits as a source of income, was engaging in psychiatric care, and had completed the core curriculum offered by D.L.S. Mother also contends that "[s]he benefitted from the services offered to her and also noticed improvement in the children's behaviors and her interactions with them."

{¶ 52} However, the record shows Mother has failed to complete any meaningful case plan services, has not been employed while this case has been pending, and does not have a stable residence. Mother claims she sees a psychiatrist regularly, who prescribes medication for her, yet Mother has never tested positive for any of the drugs she alleges were

prescribed for her. Mother has also failed, repeatedly, to complete parenting education and she has failed to engage in mental health counseling.

{¶ 53} The record also shows that Father has failed to complete any meaningful case plan services. Among other things, Father has not successfully completed substance abuse treatment or individual counseling. He was referred for those services at least twice, but has failed to follow through on those referrals. Father has never had a stable residence throughout these proceedings. While Father has remained employed, the employment was "under the table." Currently, Father has been employed through temporary employment agencies, but during his testimony he acknowledged the uncertainty and instability of such employment.

## Conclusion

{¶ 54} The record clearly and convincingly supports the juvenile court's determination that it was in the best interest of the children to award the agency permanent custody under the facts and circumstances of this case. In light of the foregoing, Mother's assignment of error is overruled, and Father's two assignments of error are overruled.

{¶ 55} Judgment affirmed.

RINGLAND and HENDRICKSON, JJ., concur.