[Cite as *In re J.F.*, 2021-Ohio-2713.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
JACKSON COUNTY

| | | |
|---|---|---|
| In the Matters of: | : | Case Nos. 21CA2 |
| | | 21CA3 |
| J.F., | : | |
| | | <u>DECISION AND</u> |
| Adjudicated Neglected Child, | : | <u>JUDGMENT ENTRY</u> |
| and | : | |
| J.A.F., | : | **RELEASED 8/03/2021** |
| Adjudicated Dependent Child. | : | |

_____
<u>APPEARANCES</u>:

James A. Anzelmo, Anzelmo Law, Gahanna, Ohio, for appellant L.A.

Steven H. Eckstein, Washington Court House, Ohio, for appellant J.F., Jr.

Matthew P. Waigand, Jackson, Ohio, for appellee.
_____
Hess, J.

{¶1}    L.A. ("Mother") and J.F., Jr. (Father") appeal from a judgment of the Jackson County Court of Common Pleas, Juvenile Division granting permanent custody of their children, J.F. and J.A.F. to Jackson County Job and Family Services (the "Agency").  We sua sponte consolidated the appeals for purposes of decision.

{¶2}    Mother presents three assignments of error.  First, Mother contends that the trial court erred by not appointing independent counsel for J.A.F. because the guardian ad litem's recommendation that the court grant permanent custody to the Agency conflicted with J.A.F.'s wish to live with Mother.  However, the record does not show that J.A.F. consistently and repeatedly expressed a desire to live with Mother such that the appointment of independent counsel was required.  Second, Mother

contends that the trial court abused its discretion by denying her motion for a continuance of the permanent custody hearing. However, Mother has not demonstrated that the trial court's decision was unreasonable, arbitrary, or unconscionable. Third, Mother contends that the Agency failed to establish by clear and convincing evidence that it should be given permanent custody of the children. However, the trial court's determination that the permanent custody requirements of R.C. 2151.414(B)(1)(d) had been satisfied was not against the manifest weight of the evidence.

{¶3} Father presents one assignment of error challenging the permanent custody award on the basis that the trial court's R.C. 2151.414(E)(12) finding is unsupported by the evidence. Father contends the court erred in finding that he will not be available to care for the children within the statute's timeframe due to incarceration because he will be eligible for judicial release soon. We reject this contention because it was unnecessary for the court to consider R.C. 2151.414(E)(12) to grant the Agency permanent custody under R.C. 2151.414(B)(1)(d), and in any event, a speculative release date is insufficient to establish that a parent will be available to care for a child within the R.C. 2151.414(E)(12) timeframe.

{¶4} Accordingly, we overrule the assignments of error and affirm the trial court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶5} On March 2, 2018, the trial court ordered the emergency removal of J.F. (then two days old) and J.A.F. (then four years old) from Mother and Father. Three days later, the Agency filed a complaint alleging that J.F. and J.A.F. were abused, neglected, and dependent children. The Agency alleged it was concerned for their

safety because Mother did not have prenatal care during her pregnancy with J.F., Mother and Father used drugs in the family home, and J.F. had a positive toxicology screen at birth. The Agency requested a disposition of temporary custody to it and moved for an emergency interim temporary custody order. The trial court issued the requested interim order that day.

{¶6} On May 24, 2018, based on the agreement of the parties, the court issued an adjudicatory order finding that J.F. was a neglected child and that J.A.F. was a dependent child. The court also issued a dispositional order returning custody to the parents with protective supervision by the Agency. However, in November 2018, the Agency moved for an expedited hearing on custody and requested temporary custody of the children. On December 21, 2018, the court conducted a hearing on the motion, at which the parents did not appear. The court granted the Agency's motion for temporary custody. On August 14, 2020, the Agency moved for permanent custody, and it later amended the motion.

{¶7} The court conducted a permanent custody hearing on October 30, 2020, and January 20, 2021. Kristin Butts, the social services supervisor at the Agency, testified that the children were initially removed due to concerns about parental drug use, Mother's lack of prenatal care, and J.F. testing positive for methamphetamine at birth and suffering withdrawal symptoms. About two months later, the parents regained custody with protective supervision by the Agency because Mother "had done a really great job getting sober" and "[t]hings were going really well." However, the Agency later sought temporary custody because Father was arrested for drug trafficking, law enforcement had found drug paraphernalia around the home, Mother had relapsed,

Mother was avoiding Agency employees, and there were concerns about J.F.'s medical care.  J.F. suffers from DiGeorge Syndrome, a genetic disorder which requires complex medical care. Butts testified that the Agency had received "lots of calls" from Nationwide Children's Hospital about J.F. missing appointments and that J.F., who was then being fed through a tube in his nose due to a cleft palate, had a "very, very low" weight.

{¶8}   Butts testified that the Agency's case plan required that the parents engage in case management services, individual counseling, parenting education, and drug treatment, and that they ensure J.F. received necessary and appropriate medical care.  Mother was engaged in counseling but had failed to complete drug treatment. Butts felt Mother was "in exactly the same place" she was when the case began.  When J.F. was born, Mother did not think she needed drug treatment.  Two and a half years later, Mother continued to use drugs and claimed that her drug use did not affect her parenting abilities even though methamphetamine is a "very dangerous drug," and J.F. needs "24/7" care.  Butts indicated that Mother regularly visited the children when permitted and did a "terrific job as a caregiver and mom" during visits.  However, she was not allowed to visit them from December 2018 to August 2019 due to her inability to produce three consecutive negative drug screens.  And since May 2020, she had consistently tested positive for methamphetamine.  Butts testified that when the case began, Mother had "a very stable residence," but she was evicted due to drug-related issues, went through "a series of apartments," and resided in a camper.  Father had been convicted of drug trafficking and was serving a 72-month prison sentence with an expected release date of February 19, 2025.

**{¶9}** Butts testified that since December 21, 2018, the children had been in the temporary custody of the Agency and in the same foster home. Butts testified that J.A.F. loves Mother but was frustrated that she promised he would be home by a certain time and that did not occur. The children had appropriate interactions with their foster caregivers, and J.A.F. seemed happy to have a stable, organized environment. Butts testified that J.A.F.'s "behaviors are somewhat difficult at times" and that he has "moments where he acts out at school," but his aggression and cursing had improved while in foster care. Butts testified that Father had not suggested any relative placement options for the children, and Mother's only suggestion had been the children's maternal grandmother, who lived with a different daughter who used drugs. Butts testified that the Agency's goal was to place the children in an adoptive home.

**{¶10}** Brittany Lowe, the on-going START (Sobriety, Treatment, and Reducing Trauma) caseworker at the Agency, testified that she was assigned to the case in August 2020. Lowe opined that Mother's camper was not appropriate for the children. When Lowe visited it in August 2020, it had one bed and did not have a working toilet, so Mother and her roommate were using a gas station bathroom. The roommate was arrested for possession of drugs in September 2020. Lowe testified that J.A.F. enjoys his visits with Mother. However, Lowe never saw him get upset when visits ended and testified that he had "no problem" leaving with members of his foster family. Lowe testified that Father talks to J.A.F. on the phone and that she recalled case plan notes about J.A.F. being excited to talk to him. Lowe testified that J.A.F. had been having "really bad outbursts at school" and was receiving mental health services. Lowe testified

that one time in September 2020, Mother was upset about J.A.F.'s appearance and made comments about his hair, ears, and fingernails.

{¶11} Travis Potts, the START coordinator at the Agency, testified that he worked with the family from November 2018 to August 2020. Potts testified that Mother had completed parenting classes, was engaged in mental health counseling, had maintained employment for the most part, and made employment a priority. However, Mother's sobriety remained an issue, and Potts opined that Mother's camper would not be a good home environment for the children given the lack of bedrooms and J.F.'s medical issues. Potts testified that the Agency had considered the children's maternal grandmother as a placement option. However, the grandmother was living with another daughter with a substance abuse issue and there was concern about whether the grandmother had cancer and would be undergoing treatment. Potts testified that if granted permanent custody, the Agency's goal was to place the children in an adoptive home.

{¶12} Officer Brant Derrow of the Wellston Police Department testified that on January 4, 2021, he was dispatched to the scene of a suspected drug overdose. Mother and an unresponsive male were at the scene. EMS pronounced the male dead. Mother told Officer Derrow that the male had used what she believed to be fentanyl. She fell asleep and when she woke up, he was lying on top of her and unresponsive. Mother denied using drugs, and Officer Derrow testified that she did not appear to be under the influence.

{¶13} Cassandra Auxier, the children's foster mother, testified that the children had adjusted well to her home, but she did not plan to adopt them if the Agency

received permanent custody.  Auxier testified that J.F. is mostly non-verbal and that he sees a speech therapist in addition to various other medical specialists.  She testified that while the children have been in her care, Mother had attended only two of J.F.'s appointments.  Auxier testified that J.A.F. is "usually pretty good" on days he is not scheduled to talk to his parents.  On days that he is, he "usually has a really hard time" at school, is "usually very defiant" after the calls, and frequently refuses to eat dinner.  He also acted "[v]ery defiant" after unsupervised visits.  Auxier testified that J.A.F. loves his parents.  She also testified that the children are "very close to each other," that it would be in the children's best interest to stay together, and that she thought the Agency intended to keep them together.

{¶14}  Attorney Jennifer Graham, the children's guardian ad litem, testified she filed a report on the first day of the permanent custody hearing recommending that the court grant the Agency permanent custody.  Her recommendation had not changed by the last day of the hearing.  Graham indicated that J.F. was unable to express his wishes about custody due to his age and being non-verbal.  She testified that J.A.F. "has never come right out and said to me that he wants to be with his parents, but he does very much express a love for his mother and questions when he will be able to go home.  At the time I spoke with him, * * * he got very emotional talking about it and he said, mommy messed up, I can't be there right now and I didn't push that."  Graham testified, "My understanding was, yeah, he wants to be home with mom, but he also seemed to have a pretty good rapport with his foster parents as well because there were other children in the home."  Later, Graham testified that J.A.F. "does love mom and at this point by all accounts it is a matter of he believes that he's going to go home

at some point." She then suggested he was not old enough to understand why that might not happen. Graham testified that Mother consistently attended visitation when permitted and that Graham had heard visits "go pretty well" and that Mother "engages with the children." In addition, Graham testified that Mother completed parenting education and maintained employment. But Graham opined that Mother's drug screens "show usage of illicit drugs which would hinder a parent's ability to take care of a child, especially a child with special needs like [J.F.]" Graham also opined that "there is a lack of permanency in a home that is a camper." Graham believed a grant of permanent custody would be in the children's best interest because they needed "some kind of permanency in their lives" and were "at an age where they could be adopted."

{¶15} D.A., the children's maternal grandmother, testified that she has three daughters. From around January 2019 until July 2020, she lived with a daughter with a drug problem. Then D.A. moved into a five-bedroom trailer, which she shares with a different daughter who does not have a drug problem and that daughter's family. D.A. testified that there is one unoccupied bedroom which is big enough for J.F. and J.A.F. D.A. testified that she is employed, has no criminal record, does not have a medical condition that would prevent her from caring for the children, and could provide them with a home and act as their custodian. D.A. testified that the Agency never contacted her about placement of the children but admitted that she had not contacted the Agency either and had not visited with the children for several months.

{¶16} Mother testified that she smokes marijuana and uses methamphetamine "a couple of times a week" but has never been charged with a crime. Mother admitted to using drugs when she and the children were at home together and that she

understood her sobriety was a big part of the reunification process. However, she did not think she had a severe drug addiction or that her drug use affected her ability to care for the children. She testified, "I can still take care of my kids, I don't neglect my kids, I don't abuse my kids, because they have everything they want." Mother testified that her camper was "temporary housing" but has a bedroom, several beds, a working toilet, and is suitable for the children. Mother admitted her roommate had a pending drug case but claimed it was supposed to be dismissed and that she was not aware of him currently using drugs. Mother indicated that when she had custody of the children, she rarely missed J.F.'s medical appointments, and she denied that he had been underweight due to neglect. Mother testified that while the children have been in foster care, she has monitored J.F.'s medical care but has been unable to attend certain appointments due to scheduling conflicts. Mother testified that she used to be an assistant manager at a Family Dollar but quit after her employer found out she was bagging items for customers without scanning them. She currently works for a different employer and took weekend shifts to be available for J.F.'s appointments.

{¶17} The parties stipulated to the admission of written testimony by Father. Father's testimony included statements that he made a "bad decision" to sell drugs to support the children, had been a "model inmate," would be eligible for judicial release in August 2021, and believed he would receive it and be able to care for the children soon.

{¶18} The trial court granted the Agency permanent custody. The court found the children had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period, and it was in their best interest to grant the Agency permanent custody. The court found that the children cannot be placed with either

parent within a reasonable period of time and should not be placed with either parent, finding R.C. 2151.414(E)(1) and (E)(4) applied to both parents, R.C. 2151.414(E)(2) applied to Mother, and R.C. 2151.414(E)(12) applied to Father.

## II.  ASSIGNMENTS OF ERROR

**{¶19}**  Mother presents three assignments of error:

1.  The trial court erred by not appointing independent counsel for J.A.F.

2.  The trial court abused its discretion by denying [Mother's] motion for a continuance, in violation of [Mother's] due process rights pursuant to the Fourteenth Amendment to the United States Constitution.

3.  Children services failed to establish, by clear and convincing evidence, that it should be given permanent custody of J.F. and J.A.F.

**{¶20}**  Father presents one assignment of error:  "The trial court's decision to award permanent custody to the Jackson County Jobs and Family Services Children's Division was against the manifest weight and sufficiency of the evidence."

## III.  APPOINTMENT OF COUNSEL

**{¶21}**  In her first assignment of error, Mother contends that the trial court erred by not appointing J.A.F. independent counsel because he "informed the guardian ad litem that he wants to return to his mother" and the guardian ad litem's recommendation that the Agency receive permanent custody conflicted with that wish.

**{¶22}**  " '[A] child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances.' "  *In re B.J.L.*, 2019-Ohio-555, 130 N.E.3d 906, ¶ 46 (4th Dist.), quoting *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, syllabus.  "[A] trial court ordinarily should appoint independent counsel for a child ' "when the child has consistently and repeatedly expressed a strong desire that differs

and is otherwise inconsistent with the guardian ad litem's recommendations." ' " *Id.* at ¶ 48, quoting *In re V.L.*, 12th Dist. Butler Nos. CA2016-03-045 to CA2016-03-047 and CA2016-03-050 to CA2016-03-052, 2016-Ohio-4898, ¶ 39, quoting *In re B.K.*, 12th Dist. Butler No. CA2010-12-324, 2011-Ohio-4470, ¶ 19. "However, a trial court generally need not ' "consider the appointment of counsel based upon a child's occasional expression of a wish to be with a parent or because of a statement made by an immature child." ' " *Id.*, quoting *In re N.P.*, 2016-Ohio-3125, 65 N.E.3d 319, ¶ 14 (11th Dist.), quoting *In re Williams*, 11th Dist. Geauga Nos. 2002-G-2454 and 2002-G-2459, 2002-Ohio-6588, ¶ 24.

{¶23} The record does not show that J.A.F. consistently and repeatedly expressed a strong desire to live with Mother, which would have been inconsistent with Graham's recommendation for a grant of permanent custody to the Agency. Although Graham testified that it was her "understanding" that J.A.F. wanted to be with Mother, Graham testified that the child "has never come right out and said to me that he wants to be with his parents." J.A.F. expressed love for Mother, believed that he would be going home at some point, and questioned when he would be able to go home. But "simply because a child is bonded to a parent * * * or even expects to be returned to a parent does not mean that the child has 'an affirmative desire to return to [the parent's] home and live with [the parent] on a permanent basis.' " (Alterations sic.) *In re C.T.L.A.*, 4th Dist. Hocking No. 13CA24, 2014-Ohio-1550, ¶ 19, quoting *In re A.T.*, 9th Dist. Summit No. 23065, 2006-Ohio-3919, ¶ 61. In addition, Graham's testimony suggests that J.A.F. might not fully understand the situation.

**{¶24}** Because J.A.F. did not consistently and repeatedly express a strong desire to live with Mother, the trial court did not err by failing to appoint him independent counsel. Accordingly, we overrule Mother's first assignment of error.

## IV. MOTION FOR CONTINUANCE

**{¶25}** In her second assignment of error, Mother contends that the trial court abused its discretion when it denied her motion for a continuance of the permanent custody hearing. Mother maintains that she provided a legitimate reason for needing a continuance. She "did not receive the guardian ad litem's report before the trial" and "did not have sufficient time to review the report before trial." Mother asserts that because the court denied a continuance, she "had to proceed with trial without having adequately prepared a defense."

**{¶26}** " 'The determination whether to grant a continuance is entrusted to the broad discretion of the trial court.' " *In re A.S.*, 4th Dist. Pike Nos. 16CA878 and 16CA879, 2017-Ohio-1166, ¶ 43, quoting *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 147. We may not reverse a trial court's denial of a continuance absent an abuse of discretion. *Id.* An abuse of discretion is "an unreasonable, arbitrary, or unconscionable use of discretion, or * * * a view or action that no conscientious judge could honestly have taken." *State v. Brady*, 119 Ohio St.3d 375, 2008-Ohio-4493, 894 N.E.2d 671, ¶ 23.

**{¶27}** "A trial court reviewing a motion for a continuance may consider the following factors: 'the length of the delay requested, prior continuances, inconvenience, the reasons for the delay, whether the defendant contributed to the delay, and other relevant factors.' " *A.S.* at ¶ 45, quoting *State v. Jordan*, 101 Ohio St.3d 216, 2004-

Ohio-783, 804 N.E.2d 1, ¶ 45. "Additionally, with respect to the continuance of juvenile court hearings, Juv.R. 23 provides that '[c]ontinuances shall be granted only when imperative to secure fair treatment for the parties.' " *Id.*

{¶28} The trial court did not abuse its discretion when it denied Mother's motion for a continuance. Mother did not request a specific duration for the continuance. The court had not previously continued the permanent custody hearing, but a continuance might have inconvenienced the court and Agency as they were prepared to proceed. Mother requested a continuance because she had not received the guardian ad litem's report. Although Graham did not file her report until the scheduled hearing date, the report was only eight pages long, and the court read it and found that "[t]here aren't any terrible surprises in the report, so it's not like anybody is prejudiced by it so we'll receive that and continue with the hearing today." Mother has not identified any specific information in the record that contradicts this finding. Therefore, we conclude that the decision to deny Mother's motion for a continuance was not unreasonable, arbitrary, or unconscionable.

{¶29} We observe that even if the trial court had erred in denying the motion, any such error was harmless. Although the trial court started the permanent custody hearing on October 30, 2020, it continued the matter and finished the hearing on January 20, 2021. The guardian ad litem did not testify until the second hearing date. Therefore, Mother had almost 12 weeks to review the report, prepare for cross-examination of the guardian ad litem, and otherwise prepare a defense to information in the report.

{¶30} We overrule Mother's second assignment of error.

### V.  MOTHER'S PERMANENT CUSTODY CHALLENGE

{¶31}  In her third assignment of error, Mother contends that the Agency failed to establish by clear and convincing evidence that it should be given permanent custody of the children.  Mother suggests that the trial court could not award permanent custody under R.C. 2151.414(B)(1)(d) because the record does not support the finding that the children had been in the Agency's temporary custody for 12 or more months of a consecutive 22-month period or that a grant of permanent custody is in their best interest.  Mother also suggests that the court could not award permanent custody under R.C. 2151.414(B)(1)(a) because the record does not establish that the children could not be placed with her within a reasonable time, that the children should not be placed with her, or that a grant of permanent custody is in their best interest.  Mother asserts that she and the children "are well bonded," that she consistently visited the children, that she did a terrific job as a caregiver and mom during visits, and that J.A.F. wants to return to her.  Mother claims that she has suitable housing for the children—her camper or D.A.'s home, where D.A. could assist with childcare.  Mother suggests the trial court improperly focused on her drug use because she "has not been charged with or convicted of criminal activity let alone unlawful drug activity," "never neglected or abused her children," completed parenting classes, attends mental health counseling, has been attentive to J.F.'s medical needs, "is gainfully employed," and "makes maintaining employment a priority." In addition, Mother claims that "J.A.F. has not adjusted well" under the Agency's care because he "has outbursts in school," "requires mental health treatment," and has "appeared unkempt."

A.  Standard of Review

**{¶32}**  "A reviewing court will not reverse a trial court's judgment in a permanent

custody case unless it is against the manifest weight of the evidence."  *In re C.S.*, 4th

Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21.  We have explained:

> "To determine whether a permanent custody decision is against the
> manifest weight of the evidence, an appellate court must weigh the
> evidence and all reasonable inferences, consider the credibility of the
> witnesses, and determine whether in resolving evidentiary conflicts, the
> trial court clearly lost its way and created such a manifest miscarriage of
> justice that the judgment must be reversed and a new trial ordered." [*In re
> T.J.*, 4th Dist. Highland Nos. 15CA15 and 15CA16, 2016-Ohio-163,] ¶ 25,
> citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972
> N.E.2d 517, ¶ 20.  In reviewing evidence under this standard, we defer to
> the trial court's determinations of matters of credibility, which are crucial in
> these cases, where demeanor and attitude are not reflected well by the
> written record.  *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415,
> 419, 674 N.E.2d 1159 (1997).
>
>          In a permanent custody case the dispositive issue on appeal is
> "whether the * * * court's findings * * * were supported by clear and
> convincing evidence."  *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825,
> 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1).  "Clear and convincing
> evidence" is "that measure or degree of proof which is more than a mere
> 'preponderance of the evidence,' but not to the extent of such certainty as
> is required 'beyond a reasonable doubt' in criminal cases and which will
> produce in the mind of the trier of facts a firm belief or conviction as to the
> facts sought to be established."  *Cross v. Ledford*, 161 Ohio St. 469, 120
> N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel.
> Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74
> N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent
> and credible evidence upon which the trier of fact reasonably could have
> formed a firm belief that permanent custody is warranted, then the court's
> decision is not against the manifest weight of the evidence."  *In re R.M.*,
> 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

*Id.* at ¶ 21-22.

B.  R.C. 2151.414(B)(1)(a) versus (B)(1)(d)

**{¶33}**  Whether R.C. 2151.414(B)(1)(a) or (B)(1)(d) applies in this case depends

on the length of time the children had been in the temporary custody of the Agency at

the time it moved for permanent custody.  R.C. 2151.414(B)(1)(a) allows a court to grant permanent custody to a public children services agency if it determines by clear and convincing evidence that permanent custody is in the best interest of the child and that "[t]he child is not abandoned or orphaned, *has not been* in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period, * * * and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents."  (Emphasis added.)  R.C. 2151.414(B)(1)(d) allows a court to grant permanent custody to a public children services agency if it determines by clear and convincing evidence that permanent custody is in the best interest of the child and that "[t]he child *has been* in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *."  (Emphasis added.)  The time between the filing of the permanent custody motion and the permanent custody hearing does not count toward this 12-month period.  *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26.

{¶34}  In this case, R.C. 2151.414(B)(1)(d) is the relevant provision, not R.C. 2151.414(B)(1)(a).  The Agency moved for permanent custody on August 14, 2020.  At that time, the children had been in the Agency's temporary custody for about 20 of the preceding 22 months, from December 21, 2018, until August 14, 2020. Thus, when the Agency moved for permanent custody, the children had been in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period.

C.  Placement with Mother

**{¶35}** Mother's challenge to the trial court's finding that the children cannot be placed with her within a reasonable time and should not be placed with her is not well-taken.  "It is well-established that under the plain language of R.C. 2151.414(B)(1)(d), when a child has been in a children services agency's temporary custody for twelve or more months of a consecutive twenty-two-month period, a trial court need not find that the child cannot or should not be placed with either parent within a reasonable time."  *In re N.S.N.*, 4th Dist. Washington Nos. 15CA6 to 15CA9, 2015-Ohio-2486, ¶ 52.  "Consequently, when considering a R.C. 2151.414(B)(1)(d) permanent custody motion, the only other consideration becomes the child's best interests."  *Id.*

D.  Best Interest of the Children

**{¶36}** R.C. 2151.414(D)(1) governs the best interest determination and provides:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

No one factor has "greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57. "Instead, the trial court considers the totality of the circumstances when making its best interest determination." *In re Z.M.*, 4th Dist. Scioto No. 18CA3856, 2019-Ohio-2564, ¶ 24.

### 1. Interactions and Interrelationships of the Children

**{¶37}** There is evidence that the parents love the children, that Mother had consistent and appropriate visits with the children when permitted, and that Father maintains contact with J.A.F. via telephone. There is evidence that J.A.F. loves his parents. J.F. appears to have some relationship with Mother and less of a relationship with Father due to his incarceration and the fact that J.F. is mostly non-verbal. D.A. has had some contact with the children but had not visited them for several months at the time she testified. There is evidence that the children have a good relationship with each other and that it would be in their best interest to stay together. In addition, there is evidence the children have a good relationship with their foster family and have adjusted well to their foster home, where J.F. has spent the majority of his life.

### 2. Wishes of the Children

**{¶38}** Graham indicated that J.F. was unable to express his wishes given his age and being mostly non-verbal. Graham testified that it was her "understanding" that J.A.F. wanted to be home with Mother. However, Graham testified that the child "has never come right out and said to me that he wants to be with his parents" and suggested he might not fully understand the situation.

### 3. Custodial History

**{¶39}** When the children were initially removed, J.A.F. had been in his parents' custody for four years and J.F. had been in their custody for two days. The children were placed in the Agency's interim temporary custody from March 2018 until May 2018, when the trial court returned them to the parents with protective supervision by the Agency. On December 21, 2018, the trial court granted the Agency temporary custody of the children. When the Agency moved for permanent custody in August 2020, the children had been in the Agency's temporary custody for twelve or more months of a consecutive twenty-two-month period.

### 4. Legally Secure Permanent Placement

**{¶40}** The Ohio Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶41}** Competent, credible evidence supports the trial court's finding that the children need a legally secure permanent placement which cannot be achieved without a grant of permanent custody to the Agency. There is evidence to support the court's finding that the parents are unable to provide a secure environment for the children. Father is incarcerated with an expected release date in February 2025 and only speculated that he would receive judicial release. Mother has a history of substance

abuse and knew that it was a barrier to reunification. As the trial court found, she "had ample time to engage in drug counseling and a sober lifestyle for her children during the pendency of this case but has continued to choose drugs over her children's well-being." She refused to acknowledge that methamphetamine use impacts her ability to care for the children, one of whom has medical issues. We cannot fault the trial court for deciding not to experiment with the children's welfare by indefinitely continuing the Agency's temporary custody to see if Mother would refrain from illegal drug activity or Father would receive judicial release and show an ability to provide the children with a secure environment. The law does not require a trial court to experiment with a child's welfare to see if the child will suffer great detriment or harm. *In re A.M.*, 4th Dist. Athens No. 17CA43, 2018-Ohio-2072, ¶ 64.

{¶42} There is evidence to support the court's finding that a suitable relative who could take legal custody of the children had not been identified. Mother and D.A. suggested that the children could live with D.A., but D.A. admitted that she had lived with a drug user (one of Mother's sisters) most of the time the children were in foster care. D.A. also admitted that she never contacted the Agency about placement with her, even after she moved in July 2020 and had a spare bedroom. There is also no evidence that D.A. pursued the matter between the first day of the permanent custody hearing when she testified and last day of the hearing.

{¶43} There is evidence that the children have done well in the Agency's custody and that the Agency intends to seek an adoptive home for them. Although J.A.F. has behavior issues, the Agency has made efforts to help him by providing mental health services. And contrary to what Mother suggests, the fact that she

complained about J.A.F.'s appearance on one occasion does not mean he received inadequate care while in the Agency's temporary custody.

### 5. Factors in R.C. 2151.414(E)(7) to (E)(11)

**{¶44}** The trial court did not find any factors in R.C. 2151.414(E)(7) to (E)(11) applied.

### 6. Totality of the Circumstances

**{¶45}** Based on the foregoing, we conclude the trial court's best interest finding was not against the manifest weight of the evidence. The Agency presented competent and credible evidence upon which the trial court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the children. The trial court properly granted the Agency permanent custody of the children under R.C. 2151.414(B)(1)(d), and we overrule Mother's third assignment of error.

### VI. FATHER'S PERMANENT CUSTODY CHALLENGE

**{¶46}** In his sole assignment of error, Father also challenges the permanent custody award. He maintains that the court's R.C. 2151.414(E)(12) finding that he will not be available to care for the children within that statute's timeframe due to his incarceration is unsupported by the evidence. Father asserts that he could be available if he gets judicial release, which he will be eligible for on August 20, 2021, or March 10, 2022.

**{¶47}** R.C. 2151.414(E) provides that if the court determines by clear and convincing evidence that one or more statutorily enumerated factors "exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." The

factor in R.C. 2151.414(E)(12) states: "The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing."

**{¶48}** Father's challenge to the trial court's R.C. 2151.414(E)(12) finding is not well-taken. It was unnecessary for the trial court to make the finding to grant permanent custody to the Agency. A grant of permanent custody under R.C. 2151.414(B)(1)(d) does not require a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *N.S.N.*, 4th Dist. Washington Nos. 15CA6 to 15CA9, 2015-Ohio-2486, at ¶ 52. Moreover, R.C. 2151.414(E)(12) is not one of the R.C. 2151.414(E) factors a trial court must consider in making a best interest determination. *See* R.C. 2151.414(D)(1)(e). In any event, any hope Father harbors of early release is purely speculative, and "we have previously rejected speculative release dates as establishing that a parent will be available to care for a child within the eighteen-month timeframe set forth in R.C. 2151.414(E)(12)." *In re C.B.C.,* 4th Dist. Lawrence Nos. 15CA18 and 15CA19, 2016-Ohio-916, ¶ 54. For these reasons, we overrule Father's sole assignment of error.

## VII. CONCLUSION

**{¶49}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellants shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Jackson County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
Michael D. Hess, Judge



## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**